Michael Yesk (SB#130056)
Megan Dailey (SB#221574)
70 Doray Drive #16
Pleasant Hill, CA 94523
(925) 849-5525
m.yesklaw@gmail.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| REY TABONES AND FELOMENA TABONES,<br><br>    Plaintiffs,<br><br>vs.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY; OCWEN LOAN SERVICING, LLC; POWER DEFAULT SERVICES, INC.; DOES 1-100, INCLUSIVE,<br><br>    Defendants. | Case No.:<br><br>VIOLATIONS OF 15 U.S.C. 1601; 15 U.S.C. 1692; 12 U.S.C § 2605; AND COMMON COUNT MONEY HAD AND RECEIVED<br><br>[28 U.S.C. § 1332(a)(1)]<br><br>JURY TRIAL DEMANDED |

## I. Introduction

1.     Plaintiffs homeowners have filed suit seeking redress for violations of the Truth-in-Lending Act, the Fair Debt Collection Practices Act, Real Estate Settlement Procedures Act, and Common Count Money Had and Received, as will be set forth below.

COMPLAINT - 1

## II. Parties

2.      Plaintiffs REY TABONES and FELOMENA TABONES (collectively "Plaintiffs") are allegedly the Trustors/Borrowesr on that certain Deed of Trust recorded against a parcel of real property located at 30 Pine Creek Court, Pittsburg, CA 94565 (hereafter "Subject Property") in the Contra Costa County Recorder's Office.  The Subject Property is Plaintiffs' primary residence.

3.      Plaintiffs are informed and believe and on that basis allege that Defendant Deutsche Bank National Trust Company ("Deutsche Bank"), is a national banking association organized under the laws of the United States, with its main office in California.

4.      Plaintiffs are informed and believe and on that basis allege that Defendant OCWEN LOAN SERVICING, LLC, ("Ocwen Loan Servicing") is limited liability company organized under the laws of the Delaware registered to do business in California.

5.      Plaintiffs are informed and believe and on that basis allege that Defendant POWER DEFAULT SERVICES, INC. ("Power Default"), is corporation organized under the laws of the Delaware registered to do business in California.

6.      Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore, sues these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

## III. Venue and Jurisdiction

7.      Plaintiffs are now, and were at all times mentioned below, domiciled in and residents of the State of California.  All Defendants are residents of different states.

8.      This action is of a civil nature involving, exclusive of interest and costs, a sum in excess of $75,000.  Every issue of law and fact in this action is wholly between citizens of

different states.  Plaintiffs are informed and believes that therefore this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1).

9.      Venue is proper pursuant to 28 U.S.C. 1391(a)(2) because the unlawful conduct is alleged to have occurred in Contra Costa County, California and Plaintiffs' home which is the subject of this litigation is located in Pittsburg, California.

### IV. Facts

10.      On April 10, 2006, Plaintiffs recorded a Deed of Trust in the Contra Costa County Recorder's Office against the Subject Property to secure a Note, in the amount of $704,000 in favor of Option One Mortgage Corporation ("Option One") as original "Lender."  The Deed of Trust names Premier Trust Deed Services, Inc. ("Premier Trust") as Trustee.  See Ex. A., Deed of Trust.

11.      Shortly after loan closing, Option One, acting as Originator, Seller and Sponsor in a securitization transaction, sold the subject mortgage loan to Financial Asset Securities Corporation (FASC), and FASC is the securitization depositor who formed the Mortgage-Backed security trust (MBS Trust): Soundview Home Loan Trust 2006-OPT5, Asset-Backed Certificates, Series 2006-OPT5 ("Series 2006-OPT5 Trust"), according to Plaintiffs' audit, the Mortgage Securitization Audit & Analysis Report.  A true and correct copy of Plaintiffs' audit is hereto attached as Exhibit B and incorporated herein by reference.  See Ex. B, p. 23 & 44.

12.      Pursuant to the Pooling and Servicing Agreement ("PSA"), securitization depositor FASC was the owner of the Mortgage loan before it was sold and conveyed to Trustee DBNTC in return for mortgage pass through certificates.  For federal income tax purposes the Trust consisted of Real Estate Mortgage Investment Conduit (REMIC) trusts pursuant to the tax code of 1986, as amended.  In accordance with the Trust's REMIC election and continuing qualification, the PSA specified a "cut-off date" on June 1, 2006 and a REMIC "start-up day" (also the closing date) on June 19, 2006.  The strict terms and REMIC provisions of the PSA

1   mandate a "true sale" transaction, i.e., absolute sale of mortgage loans without recourse between

2   Seller/Sponsor Option One, and Depositor Financial Asset Securities Corporation ("FASC"), and

3   from FASC to DBNTC, in its capacity as Trustee of the Series 2006-OPT5 Trust for the benefit

4   of its certificate holders (investors).

5         13.    June 20, 2008, a Notice of Default was recorded in the Contra Costa County

6   Recorder's Office, signaling the commencement of the foreclosure process.   The Notice of

7   Default was executed by AHMSI Default Services, Inc., by T.D. Services Company as Agent for

8   the Trustee by Fidelity National Title as Agent.

9         14.    On July 21, 2008, an Assignment of Deed of Trust was recorded in the Contra

10   Costa County Recorder's Office.   The Assignment purports to transfer the beneficial interest in

11   the Deed of Trust from Option One to Deutsche Bank, as Trustee for the Certificateholders of the

12   Soundview Home Loan Trust 2006, Asset-Backed Certificates, Series 2006-OPTS.   A true and

13   correct copy of the Assignment of Deed of Trust is attached hereto as Exhibit C.

14         15.    On July 25, 2008 a Substitution of Trustee was recorded in the Contra Costa

15   County Recorder's Office.   Through this document, Deutsche Bank, as Trustee for the Series

16   2006-OPTS Trust, purports to make a substitution of Trustee in favor of AMHMSI Default

17   Services, Inc. The Substitution of Trustee was signed by Option One Mortgage as alleged

18   Attorney in Fact for Deutsche Bank, the alleged beneficiary.   A true and correct copy of the

19   Substitution of Trustee is attached hereto as Exhibit D.

20         16.    On October 2, 2008, a Notice of Rescission of the Notice of Default was recorded

21   in the Contra Costa County Recorder's Office

22         17.    On April 1, 2011, a second Notice of Default was recorded in the Contra Costa

23   County Recorder's Office.   The second Notice of Default was executed by Default Resolution

24   Network as Agent for the Beneficiary, its Agent through ServiceLink as agent, through SPL Inc.,

25

26

as authorized agent. A true and correct copy of the second Notice of Default is attached hereto as Exhibit E.

18. On August 12, 2011, a second Substitution of Trustee was recorded in the Contra Costa County Recorder's Office. Then, n this document, Defendant Deutsche Bank, as alleged beneficiary, purports to make Power Default the Trustee under the Deed of Trust. One that same day, a Notice of Trustee's Sale was also recorded by Power Default. On November 16, 2011 another Notice of Trustee's Sale was recorded.

19. On February 13, 2013, Plaintiffs received a letter informing them the Ocwen Loan Servicing would become the servicer of their loan on March 1, 2013.

20. On March 29, 2013 a Notice of Trustee's Sale was recorded by Fidelity National Title Company as agent for Power Default, substituted Trustee. A true and correct copy of the March 29, 2013 Notice of Trustee's Sale is attached hereto as Exhibit F.

### A. First Cause of Action for TILA 15 U.S.C. § 1601, et.seq., as amended (1994)

21. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

22. Defendants Deutsche Bank and Power Default claim to be successors in interest to Option One and Premier Trust, respectively, and therefore, assert rights in privity with Plaintiffs. Thus, Defendants violated TILA by failing to provide Plaintiffs with the accurate material disclosures required under TILA and by not taking into account the State Legislature's intent of ensuring home buyers are fully aware of the pros and cons of adjustable rate mortgages in a language (both written and spoken) that they can understand and comprehend and advising buyers to compare similar loan products with other lenders. TILA also requires the lender to offer other loan products that might be more advantageous for the borrower under the same qualifying matrix.

23.     Defendants similarly violated 15 U.S.C § 1641(g), titled "Liability of Assignee," TILA which requires that when an entity purchases or is assigned the beneficial interest in a loan on a property, it must notify the borrower in writing within 30 days of when the loan is transferred. 15 U.S.C. § 1641(g) (entitling Plaintiffs to actual damages or statutory damages in an amount of not less than $400 and not greater than $4,000. 15 U.S.C. § 1640(a)).

24.     Although Power Default, as alleged Trustee, would generally not be subjected to TILA, under California law (*see Heritage Oaks Partners v. First Am. Title Ins. Co.*, 66 Cal. Rptr. 3d 510, 514 (Ct.App. 2007)), Plaintiff alleges upon information and belief that Power Default is a party in privity to the PSA under the law of agency and liable under the indemnification provision of the Series 2006-OPT5 Trust for the acts which constitute a violation of sub-section (g) of TILA under California Civil Code § 2315 which provides that "[a]n agent has such authority as the principal, actually or ostensibly, confers upon him." Deutsche Bank and Power Default violated subsection (g) because they failed to notify Plaintiffs of the transfer of the beneficial interest in the Deed of Trust within the required 30 days. The Assignment of Deed of Trust was recorded on July, 2008, allegedly made Deutsche Bank, as Trustee for the Series 2006-OPT5 Trust, but Plaintiffs' received no notice of this transfer or the previous securitization. Failing to properly notify within the statutory period, Defendants have an obligation both from the terms of the PSA and under TILA. And on the same theory of privity Defendants accede by agency and as successors in interest to the liability of Option One and or predecessors in interest to acts in violation of TILA at origination.

25.     Plaintiffs allege an indemnification provision exists within the PSA to the Series 2006-OPT5 Trust which is included in most PSA agreements, upon information and belief (a copy of the subject PSA has yet to be discovered although most provisions are even broader than that referenced here) and which provision would inculpate Defendants for breaches of the PSA

1  including the faulty assignment which also violated TILA.   Any uncertainty as to the breadth of

2  the indemnification provision of the PSA should be cured though the discovery process.

3     26.    Any and all statute[s] of limitations relating to disclosures and notices required

4  pursuant to 15 U.S.C. § 1601, et seq. were tolled due to Defendants' failure to effectively

5  provide the required disclosures and notices, including but not limited to Defendants failure to

6  provide disclosures regarding payment schedules and terms and violations of prohibitions

7  regarding high-rate, high-fee loans, and assignment of ownership interest in Plaintiffs' loan.

8     27.    As the assignee, Deutsche Bank, and its agents Power Default, and Ocwen Loan

9  Servicing fall squarely within 15 U.S.C. § 1641(g), which creates liability for the assignee of the

10  loan's original creditor if the assignee fails to notify the borrower of the acquisition. *See Vogan*

11  *v. Wells Fargo Bank, N.A*; USDC EDCA Case No. 2:11-cv-02098-JAM-AC (Nov. 17, 2011)

12  (unpublished).

13     28.    An actual controversy now exists between Plaintiffs and Defendants.  Plaintiffs

14  contend they have the right to rescind the loan and that Defendants are strangers to the loan and

15  based on information and belief Defendants deny that right.

16     29.    As a direct and proximate result of Defendants' violations Plaintiffs have incurred

17  and continue to incur damages in an amount to be proven at trial, including without limitation,

18  statutory damages and all amounts paid or to be paid in connection with the transaction.

19     30.    Defendants were unjustly enriched at the expense of Plaintiffs and therefore

20  Plaintiffs are entitled to equitable restitution and disgorgement of profits obtained by Defendants.

21     31.    Defendants' actions in this matter have been willful, knowing, malicious,

22  fraudulent and oppressive, entitling Plaintiffs to punitive damages in an amount appropriate to

23  punish Defendants and to deter others from engaging in the same behavior.

24     WHEREFORE, Plaintiff prays for judgment against defendants and each of them, as set

25  forth below:

26

### B. Second Cause of Action for Violation of the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.)

32.     Plaintiffs re-allege and incorporate by reference all prior paragraphs in this complaint, as though fully set forth herein.

33.     Defendants are debt collectors within the meaning of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, ("FDCPA"). See 15 U.S.C. § 1692a(6), *Birster v. American Home Mortgage Servicing, Inc.*, U.S. Ct of Appeals, 11th Cir., Case No. 11-13574-G.

34.     Defendants Power Default, Deutsche Bank, and Ocwen Loan Servicing violated the FDCPA because they "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." See 15 U.S.C. § 1692a(6). Defendants hold themselves out to have interests in Plaintiffs' Loan and Deed of Trust, yet the July 21, 2008 Assignment of the Deed of Trust was recorded more than two years after the June 1, 2006 closing date of the Series 2006-OPT5 Trust, rendering the attempted assignment void. Defendant Deutsche Bank, as Trustee for the Series 2006-OPT5 Trust, thus cannot be the true present beneficiary and neither Deutsche Bank, nor any of its agents could validly execute a substitution of Trustee in favor of Power Default.

35.     Defendants violated the FDCPA with actions pertaining to enforcement of the Note and Plaintiffs; Deed of Trust with challenged debt collection conduct including Section 2923.5 compliance, which failed to include the FDCPA Mini Miranda Warning and FDCPA 30-day validation notice requirements in the recorded documents.

36.     Nowhere in any of Defendants' correspondence or verbal communications regarding California Civil Code Section 2923.5 compliance, in the Notice of Default or otherwise, did Defendants state that as required by the FDCPA, "This is an attempt to collect a debt. Any information will be used for that purpose."

37.     Nowhere within the Defendants correspondence or verbal communications regarding Section 2923.5 compliance, in the Notice of Default or otherwise, did Defendants state

that within 5 days of any initial communication with Plaintiffs, Defendants must notify Plaintiffs, in writing, of Plaintiffs' debt validation rights. This notice of dispute rights is required by the FDCPA regardless of the method of the debt collector's initial communication, whether it was a phone call, a letter, or even a legal summons.

38. The debt collector's debt validation notice should have included the amount of the debt, the name of the creditor to whom the debt was owed, that Plaintiffs had 30 days to dispute the debt, notification that the Plaintiffs had the right to have the verification mailed to Plaintiffs, and notification that Plaintiffs can request the name and address of the original creditor within 30 days.

39. Nowhere within the Defendants correspondence or verbal communications regarding Section 2923.5 compliance, in the Notice of Default or otherwise, did Defendants inform Plaintiffs of his aforementioned rights to dispute under FDCPA.

40. Therefore, Defendants violated the FDCPA and clouded title to Plaintiffs' property and subsequently caused Plaintiffs to lose title to his home.

41. The illegal debt collection activities cast doubt on Plaintiffs' title. Plaintiffs have suffered a direct financial loss as a result of the recordation of these false documents. And Defendants were not authorized by the actual Beneficiary of the Deed of Trust to provide servicing activities to Plaintiffs' Deed of Trust. Beginning shortly after the recordation of the Deed of Trust on April 16, 2008 through the present, Defendants continued wrongfully to send monthly bills to the Plaintiffs, which bills Plaintiffs paid. Plaintiffs suffered prejudice and pecuniary harm as a result of the recorded documents because Plaintiffs' account with the true beneficial interest holder was never credited for these payments.

42. Plaintiffs have suffered damages as a direct and proximate result of Defendants' actions as herein described as he lost title to the property. These damages are irreparable should any of the Defendants, or any of their agents, disposes Plaintiffs' from the property, despite

having no legal interest in the property, no legal right to collect upon Loan and having completed an invalid foreclosure.  Plaintiffs seek an injunction because real property is considered unique in California, and monetary damages are deemed inadequate to compensate Plaintiffs for the loss thereof. *Stockton v. Newman* 148 Cal. App. 2d 558, 564 (1957); however, at this time, Plaintiffs' damages include but are not limited to loss of equity and diminution in value of the Subject Property.

43.    Defendants' false and wrongful collections demonstrate a false claim of right, title or interest in the subject property which gives rise to a need for policy endorsements for title insurance, settlement of a claim shown on a title report, and/or a significant dissuasive factor for any prospective purchaser inspecting the property for sale, and/or its disclosures, any and all of which factors negatively affected and continue to affect the purchase price and vendibility of the Subject Property in an amount to be proven at trial.

44.    The aforementioned wrongful actions taken by Defendants made it necessary for Plaintiffs to retain attorneys and to bring this action to cancel the instruments casting doubt on Plaintiffs' title. Therefore, Plaintiffs are entitled to recover attorneys' fees and costs incurred in cancelling the instrument.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known, or on proof at the time of trial.

WHEREFORE, Plaintiffs prays for judgment against defendants and each of them, as set forth below:

## C.  Third Cause of Action For Violation of 12 U.S.C. § 2605 By Plaintiffs Against All Defendants

45.    Plaintiffs re-allege and reincorporate by reference the allegations in all paragraphs above as though fully set forth herein.

46. Plaintiff submitted a Qualified Written Request ("QWR") pursuant to RESPA procedures for the resolution of loan servicing disputes under 12 U.S.C. § 2605, Section 6, and to Deutsche Bank and Ocwen Loan Servicing and Power Default, for information pertaining to Plaintiffs' Note transaction and related indebtedness.

47. The QWR included a request that Defendants provide the "name and address of Note holder."

48. Defendants violated RESPA, 12 U.S.C. § 2605(e)(2), by failing to properly respond to Plaintiff's QWR; although a response was received from Defendants within 60 days (the "June 4, 2013 QWR Response") this response fails to meet the requirements of RESPA as is set forth below.

49. Defendants responses were in violation of § 2605(e)(2)(A) because the response attempted to validate the borrower's account as correct; which is false because Defendants claim title pursuant to a post-closing transfer to the trust in violation of the Pooling and Servicing Agreement for the Series 2006-OPT5 Trust under the holding in *Glaski v. Bank of America*, 218 Cal.App. 4th 1079: that acts in contravention of the trust are void and not voidable

50. Defendants are liable for violation of RESPA, 12 U.S.C. § 2605, Section 6. See also *Johnson v. HSBC Bank USA, N.A., as Trustee for the Ellington Trust Series 2007-1*, United States District Court, Southern District of California, Case No. 3:11-cv-2091-JM-WVG at p. 4 (unpublished) (finding sufficient allegations of improper assignment where "the assignment was made after the closing date of the trust, as required by Section 2.1 of the PSA.")

51. Here, as in *Johnson v. HSBC*, Defendants maintain a right to the power of sale and beneficial interest on Plaintiffs' Deed of Trust despite the improperly documented transfer of interest. *See also Vogan v. Wells Fargo Bank, N.A.*, 2011 WL 5826016 (E.D. Cal. 2011) (allowing § 17200 claim when plaintiffs alleged that assignment was executed after the closing

1   date of securities pool, "giving rise to a plausible inference that at least some part of the recorded

2   assignment was fabricated.")

3       52.    The true facts at the time Plaintiffs' QWRs were posed to Wells Fargo and JP

4   Morgan were that there was no or no identifiable beneficial interest holder.  The July 21, 2008

5   Assignment of Deed of Trust (Ex. C) in favor of Deutsche Bank National Trust Company, as

6   Trustee for the Certificateholdes of Soundview Home Loan Trust 2006-OPT5, Asset-Backed

7   Certificates, Series 2006-OPT5, 1761 East St. Andrew Place Santa Ana, CA 92705-4934, is

8   insufficient to transfer the beneficial interest to the Series 2006-OPT5 Trust, because the trust

9   closed and cannot accept new assignments.

10       53.    Therefore, Defendants cannot indicate with any accuracy or truthfulness for

11   whom they were acting in servicing Plaintiffs' Note as of the dates of Plaintiffs' QWR and more

12   importantly, into whose pockets Plaintiffs' mortgage payments were being deposited.  In doing

13   so, Defendants acted in furtherance of a fraud upon Plaintiffs and the true beneficial interest

14   owner under the Deed of Trust, and in violation of the QWR disclosure requirements of RESPA.

15   But for the actions of Defendants in disguising and concealing the true owner of the Note,

16   Plaintiffs would have been credited for payments of principal and interest toward the purchase of

17   the Subject Property, which he never received.

18       54.    Duetsche Bank did not receive an Assignment of Deed of Trust in a timely

19   manner, and/or at all, and was never named as the owner of the Note.  Any transfer of interest

20   must be recorded within 90 days pursuant to the Series 2006-OPT5 Trust Pooling and Service

21   Agreement ("PSA Agreement") which requires assets be transferred to the trust fund within 90

22   days following the closing date.  The closing date for the Series 2006-OPT5 Trust was on June

23   19, 2006 and the Assignment of Deed of Trust was not recorded until July 21, 2008.  (Ex. C)

24       55.    The July 21, 2008 Assignment of Deed of Trust and any further Assignment of

25   Deed of Trust would be invalid and wrongful because the Securitized Trust of which Wells

26

Fargo is the Trustee had already closed and the transfer did not take place within 90 days, as required by the PSA Agreement.

56.     Even if the Securitized Trust was still accepting new assets, any purported transfer from MERS would have been impossible without giving up its tax-free status as a REMIC under IRC 860G due to the parties breaching the PSA Agreement and failing to record said transfer within 90 days of closing.

57.     Therefore, if Deutsche Bank as Trustee asserts that it violated the PSA Agreement and the Prospectus and accepted the Plaintiffs' loan after the closing date, then it must pay the 100% tax penalty that violation of these documents causes to accrue.

58.     Plaintiffs have been harmed by the Defendants failure to adequately respond to their Qualified Written Request because they are unsure which of these entities actually holds their Note and whether their payments have been properly applied, and never received credit for payments made after the close of business of the original lender and/or the Trust.

59.     Plaintiffs have suffered damages arising out of the numerous violations of RESPA as alleged herein, and as indicated in Plaintiffs' audit report.

60.     As a result of Defendants violations of RESPA, Plaintiffs have suffered actual damages, including but not limited to devastation of their reputation and credit rating, monetary damages, and the impending foreclosure of their home, in an amount to be proven at trial.

61.     Plaintiffs' general damages also include mental anguish, inconvenience, and worries that he will lose his home, as well as late fees, all of which have been found to be recoverable under *Johnstone v. Bank of America, N.A.,* USDC, N.D. Illinois, Case No. 01 C 292 (Nov. 15, 2001).

62.     In addition, pursuant to 12 U.S.C. § 2605(f)(3), Plaintiffs are entitled to recover their reasonable attorney's fees and costs incurred in bringing this action.

WHEREFORE, Plaintiff prays for judgment against defendants and each of them, as set forth below:

### D. Fourth Cause of Action for Common Count Money Had and Received by Plaintiffs Against All Defendants

63.     Plaintiffs allege and incorporate by reference the allegations as contained in the prior paragraphs hereto.

64.     Plaintiffs claim that Defendants Deutsche Bank and Ocwen Loan Servicing owe her damages, including economic damages under the common count cause of action for money had and received.  As one court explained, citing directly to Witkin, "'[a] common count is proper whenever the plaintiff claims a sum of money due, either as an indebtedness in a sum certain, or for the reasonable value of services, goods, etc., furnished. It makes no difference in such a case that the proof shows the original transaction to be an express contract, a contract implied in fact, or a quasi-contract'.... A claim for money had and received can be based upon money paid by mistake, money paid pursuant to a void contract, or a performance by one party of an express contract."  *Utility Audit Co. v. City of Los Angeles* 112 Cal.App.4th 950, 958 (2003).

65.     As courts have explained "This kind of action to recover back money which ought not in justice to be kept is very beneficial, and, therefore, much encouraged.  It lies for money paid by mistake, or upon a consideration which happens to fail, or extortion, or oppression, or an undue advantage of the plaintiff's situation contrary to the laws made for the protection of persons under those circumstances." *Minor v. Baldridge* 123 Cal. 187 (1898).

66.     In the instant case, Defendants Deutsche Bank and Ocwen Loan Servicing and Power Default received money that was intended to be used for the benefit of Plaintiffs. Defendants received funds arising out of Plaintiffs' obligations under the Note for the purchase of the Property.

67. None of Plaintiffs' monthly mortgage payments beginning on or around July 2006 and continuing to the present day in the amount of approximately $3,031 per month, according to proof, have been credited to her accounts with the true beneficial holder pursuant to the securitization transaction(s): the certificate holders of the Series 2006-OPT5 Trust from on or about July 2006, up to and through trial, according to Plaintiffs' securitization audit. See Ex. B at p.21. Therefore, Deutsche Bank and Ocwen Loan Servicer wrongfully received 58 months of payments in the approximate amount of $175,798 until the alleged default on or around April 11, 2011, or until and through trial, according to proof, which were never credited to Plaintiffs' account with the certificate the Series 2006-OPT5 Trust.

68. Plaintiffs are informed and believe and thereon alleges that of this $175,798 Ocwen Loan Servicing wrongfully made payments in the amount of sums to be proven at trial to Deutsche Bank as Trustee to the Series 2006-OPT5 Trust for trustee services paid by Plaintiffs according to the terms of Plaintiffs' Note against principal and interest charges, which were never credited to the certificate holders of the Series 2006-OPT5 Trust who were entitled to those principal and interest payments.

69. The monies received by Defendants were not used for the benefit of Plaintiffs and applied to her obligations under the Note, and Defendants Ocwen Loan Servicing and Deutsche Bank have not given the money to Plaintiffs or otherwise settled Plaintiffs' claims in this matter.

70. Defendants Ocwen Loan Servicing as servicer, and Deutsche Bank, as Trustee for the securitized trust received payments arising out of Plaintiffs' Note that were not credited to Plaintiffs due to the unrecorded Assignment of Deed of Trust from Option One to the Series 2006-OPT5 Trust on or before the June 19, 2006 closing date for the Series 2006-OPT5 Trust. Deutsche Bank and Ocwen Loan Servicing thereafter received mortgage payments from Plaintiffs for another 58 months.

WHEREFORE, plaintiff prays judgment against defendants and each of them, as set forth below:

### Prayer for Relief

WHEREFORE, Plaintiffs Rey Tabones and Felomena Tabones pray for a judgment against the Defendants, and each of them, as follows:

1. For a judgment declaring that Deed of Trust recorded as document no. 2006-0109505-00 in the Contra Costa County Recorder's Office invalid and any subsequent proceedings based on these documents are also invalid, including the Notice of Trustee's Sale.

2. For a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining Defendants and their respective agents, servants, and employees, and all persons acting under, in concert with, or for them, from asserting any interest in the Subject Property or otherwise attempting in any manner to dispossess Plaintiffs from possession of the Subject Property; or taking any action to enforce any other remedy purportedly provided to them by the Deed of Trust;

3. For a judgment forever enjoining said Defendants from claiming any estate, right, title or interest in the subject property;

4. For an order compelling said Defendants to transfer legal title and possession of the Subject Property to Plaintiffs herein;

5. For damages according to proof at trial;

6. For costs of suit and attorneys' fees herein incurred;

7. For punitive damages according to proof at trial;

8. For statutory damages; and

9. For such other relief as the Court may deem just and proper.

### Demand for Jury Trial

Plaintiffs hereby demand a trial by jury of each and every claim so triable.

DATED: November 8, 2013          Respectfully submitted,

Megan Dailey
Attorney for Plaintiff
70 Doray Drive, Suite 16
Pleasant Hill, CA 94523
925.849.5525

Exhibit A

EXHIBIT B

RECORDING REQUESTED BY
FINANCIAL TITLE COMPANY

PREPARED BY AND
WHEN RECORDED MAIL TO:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 57096
IRVINE, CA 92619-7096

ATTN: RECORDS MANAGEMENT

Loan Number: 581008184
Servicing Number: 002128925-1

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2006-0109505-00
Acct 5- Financial Title
Monday, APR 10, 2006 08:00:00
MIC   $1.00:MOD    $13.00:REC   $17.00
TCF   $12.00:DAF    $1.80:REF    $0.20
Ttl Pd   $45.00          Nbr-0003192053
                              cgv/R2/1-13

[Space Above This Line For Recording Data]

## DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on     April 03, 2006
The trustor is
REY TABONES   AND FELOMENA TABONES,   HUSBAND AND WIFE AS JOINT TENANTS

("Borrower").

The trustee is     PREMIER TRUST DEED SERVICES, INC.

("Trustee").

The beneficiary is
    Option One Mortgage Corporation, a California Corporation
which is organized and existing under the laws of     CALIFORNIA
and whose address is     3 Ada, Irvine, CA   92618

("Lender").

Borrower owes Lender the principal sum of
SEVEN HUNDRED FOUR THOUSAND   DOLLARS NO CENTS
. . .AND NO/100THs     Dollars (U.S. $704,000.00     ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on     May 01, 2036
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in     Contra Costa     County, California:
097-490-040

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

which has the address of     30   PINE CREEK CRT,  PITTSBURG

(Street, City)

California     94565-7355     ("Property Address");
            (Zip Code)

CALIFORNIA - Single Family
Page 1 of 8

CAD10011 (10-07-98)

109505

Loan Number: 581008184          Servicing Number: 002128925-1          Date: 04/03/06

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property".

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federal related mortgage loan may require for Borrower's escrow account under the Federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. @ 2601 est seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits or accounts of which are insured or guaranteed by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not Charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; last, to any late charges due under the Note.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this

CAD10012 (10-07-98)

109505

Loan Number:    581008184         Servicing Number:    002128925-1          Date:    04/03/06

Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

    5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

    All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

    Unless Lender and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as Lender may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

    Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

    If Borrower obtains earthquake insurance, any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder, and (ii) be subject to the provisions of this paragraph 5.

    6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.

    Borrower acknowledges that the Lender does not desire to make a loan to Borrower secured by this property on the terms contained in the Note unless the property is to be occupied by Borrower as Borrower's primary/secondary residence. Lender makes non-owner residence loans of different terms. Borrower promises and assures Lender that Borrower intends to occupy this property as Borrower's primary/secondary residence and that Borrower will so occupy this property as its sole primary/secondary residence within sixty (60) days after the date of the Security Instrument. If Borrower breaches this promise to occupy the property as Borrower's primary/secondary residence, then Lender may invoke any of the following remedies, in addition to the remedies provided in the Security Instrument; (1) Declare all sums secured by the Security Instrument due and payable and foreclose the Security Instrument, (2) Decrease the term of the loan and adjust the monthly payments under the Note accordingly, increase the interest rate and adjust the monthly payments under the Note accordingly, or (3) require that the principal balance be reduced to a percentage of either the original purchase price or the appraised value then being offered on non-owner occupied loans.

    Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto, the validity or priority of the lien created by this Security Instrument, or the rights

CAD10013 (10-07-98)

109505

Loan Number: 581008184     Servicing Number: 002128925-1     Date: 04/03/06

or powers of Lender or trustee with respect to this Security Instrument or the Property. All causes of action of Borrower, whether accrued before or after the date of this Security Instrument, for damage or injury to the Property or any part thereof, or in connection with any transaction financed in whole or in part by the proceeds of the Note or any other note secured by this Security Instrument, by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid directly to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by this Security Instrument or to any deficiency under this Security Instrument or may release any monies so received by it or any part thereof, as Lender may elect. Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof. Borrower agrees to execute such further assignments and any other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

      7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

      Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate in effect from time to time and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

      8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

      9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

      10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

      If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

      Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

      11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

      12. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this

Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law. The holder of the Note and this Security Instrument shall be deemed to be the Lender hereunder.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and

109505

to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Borrower shall be solely responsible for, shall indemnify, defend and hold harmless Lender, its directors, officers, employees, attorneys, agents, and their respective successors and assigns, from and against any and all claims, demands, causes of action, loss, damage, cost (including actual attorneys' fees and court costs and costs of any required or necessary repair, cleanup or detoxification of the Property and the preparation and implementation of any closure, abatement, containment, remedial or other required plan), expenses and liability directly or indirectly arising out of or attributable to (a) the use, generation, storage, release, threatened release, discharge, disposal, abatement or presence of Hazardous Substances on, under or about the Property, (b) the transport to or from the Property of any Hazardous Substances, (c) the violation of any Hazardous Substances law, and (d) any Hazardous Substances claims.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, or other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

ADDITIONAL COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. If any monthly installment under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other deed of trust or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice and regardless of any prior forbearance. In such event, Lender, at its option, may then or thereafter deliver to Trustee a written declaration of default and demand for sale and shall cause to be filed of record a written notice of default and of election to cause to be sold the Property. Lender shall also deposit with Trustee this Security Instrument and any notes and all documents evidencing expenditures secured hereby.

After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Borrower, shall sell the Property at the time and place specified by Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Lender may offset its bid to the extent of the total amount owing to it under the Note and this Security Instrument, including Trustee's fees and expenses. Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. Trustee may postpone the time of sale of all or any portion of the Property by public declaration made by Trustee at the time and place last appointed for sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall release this property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for releasing the Property for services rendered if the charging of the fee is permitted under applicable law.

23. Substitute Trustee. Lender may, from time to time, by instrument in writing, substitute a successor or successors to any Trustee named in this Security Instrument or acting hereunder. Such instrument shall be executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the property is situated and shall be conclusive proof of the proper substitution of such successor Trustee or Trustees. Such successor Trustee or Trustees shall, without conveyance from the predecessor Trustee, succeed to all its title, estate, rights, powers and duties. The procedure herein provided for substitution of Trustees shall not be exclusive of other provisions for substitution permitted by law.

24. Request for Notices. Borrower requests that copies of the notices of default and sale be sent to Borrower's address

Loan Number: 581008184        Servicing Number: 002128925-1        Date: 04/03/06

which is the Property Address.

25. Statement of Obligation Fee. Lender may collect a fee equal to the maximum amount as may from time to time be allowed by law for furnishing any statement of obligation, beneficiary's statement, beneficiary's demand or any other statement regarding the condition of or balance owing under the Note or secured by this Security Instrument.

26. Offsets. No indebtedness secured by this Security Instrument shall be deemed to have been offset or to be offset or compensated by all or part of any claim, cause of action, counterclaim or crossclaim, whether liquidated or unliquidated, which Borrower (or subject to Paragraph 17 of this Security Instrument, any successor to Borrower) now or hereafter may have or may claim to have against lender; and, in respect to the indebtedness now or hereafter secured hereby, Borrower waives, to the fullest extent permitted by law, the benefits of California Code of Civil Procedure Section 431.70 (and any successor laws) and any comparable or similar law of any other jurisdiction. Section 431.70 of the California Code of Civil Procedure provides as follows:

"Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this section is not available if the cross-demand is barred for failure to asset it in a prior action under Section 426.30. Neither person can be deprived of the benefits of this section by the assignment or death of the other. For the purposes of this section, a money judgment is a "demand for money" and, as applied to a money judgment, the demand is barred by the statute of limitations when enforcement of the judgment is barred under Chapter 3 (commencing with Section 683.010) of Division 1 of Title 9."

27. Misrepresentation and Nondisclosure. Borrower has made certain written representations and disclosures in order to induce Lender to make the loan evidenced by the Note or notes which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument, irrespective of the maturity date specified in the Note or notes secured by this Security Instrument, immediately due and payable. Trustee, upon presentation to it of an affidavit signed by Lender setting forth facts showing a default by Borrower under this paragraph, is authorized to accept as true and conclusive all facts and statements therein, and to act thereon hereunder.

28. Time is of the Essence. Time is of the essence in the performance of each provision of this Security Instrument.

29. Waiver of Statute of Limitations. The pleading of the statute of limitations as a defense to enforcement of this Security Instrument, or any and all obligations referred to herein or secured hereby, is hereby waived to the fullest extent permitted by law.

30. Modification. This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender or lawful successors in interest.

31. Construction of the Security Instrument. Borrower and Lender agree that this Security Instrument shall be interpreted in a fair, equal, and neutral manner as to each of the parties, notwithstanding the provisions of Section 1654 of the California Civil Code. Section 1654 of the California Civil Code provides as follows:

"In the cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."

32. Reimbursement. To the extent permitted by applicable law, Borrower shall reimburse Trustee and Lender for any and all costs, fees and expenses which either may incur, expend or sustain in the execution of the trust created hereunder or in the performance of any act required or permitted hereunder or by law or in equity or otherwise arising out of or in connection with this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Trustee and Lender their fees in connection with Trustee and Lender including, but not limited to assumption application fees; fees for payoff demands and, statements of loan balance; fees for making, transmitting and transporting copies of loan documents, verifications, full or partial lien reconveyances and other documents requested by borrower or necessary for performance of Lender's rights or duties under this Security Instrument; fees arising from a returned or dishonored check; fees to determine whether the Property is occupied, protected, maintained or insured or related purposes; appraisal fees, inspection fees, legal fees, broker fees, insurance mid-term substitutions, repair expenses, foreclosure fees and costs arising from foreclosure of the Property and protection of the security for this Security Instrument; and all other fees and costs of a similar nature not otherwise prohibited by law.

33. Clerical Error. In the event Lender at any time discovers that the Note, any other note secured by this Security Instrument, the Security Instrument, or any other document or instrument executed in connection with the Security Instrument, Note or notes contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to reexecute any documents that are necessary to correct any such error(s).

109505

Loan Number: 581008184          Servicing Number: 002128925-1          Date: 04/03/06

Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.

34. Lost Stolen, Destroyed or Mutilated Security Instrument and Other Documents. In the event of the loss, theft or destruction of the Note, any other note secured by this Security Instrument, the Security Instrument or any other documents or instruments executed in connection with the Security Instrument, Note or notes (collectively, the "Loan Documents"), upon Borrower's receipt of an indemnification executed in favor of Borrower by Lender, or, in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan Document, and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Loan Documents, and may be treated for all purposes as the original copy of such Loan Document.

35. Assignment of Rents. As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property. Borrower shall have the right to collect and retain the rents of the Property as they become due and payable provided Lender has not exercised its rights to require immediate payment in full of the sums secured by this Security Instrument and Borrower has not abandoned the Property.

36. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] No Prepayment Penalty Option Rider | [ ] Planned Unit Development Rider | [ ] Occupancy Rider |
| [ ] Other(s) (specify) | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____

REY TABONES                              -Borrower          _____ -Borrower

FELOMENA TABONES                         -Borrower          _____ -Borrower

_____         -Borrower          _____ -Borrower
[Space Below This Line For Acknowledgment]

State of California, County of _____Contra Costa_____                    )SS:

On __4/3/06__ _____ before me, _Zennen S. Alpuerto, a notary public_

personally appeared _Rey Tabones and Felomena Cayabyab Tabones_

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.
(Reserved for official seal)

Signature _____

Zennen S. Alpuerto
Name (typed or printed)
My commission expires: __5/19/09__

ZENNEN S. ALPUERTO
Commission # 1580076
Notary Public · California
Contra Costa County
My Comm. Expires May 19, 2009

Page 8 of 8

CAD10018 (10-07-98)

ZENAIDA S. ALBUERTO
Commission # 1580076
Notary Public - California
Contra Costa County
My Comm. Expires May 19, 2009

109505

Loan Number: 581008184    Servicing Number: 002128925-1    Date: 04/03/06

## ADJUSTABLE RATE RIDER
## (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made April 03, 2006 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Adjustable Rate Note (the "Note") to
    Option One Mortgage Corporation, a California Corporation
(the "Lender") of the same date and covering the property described in the Security Instrument and located
at:

30 PINE CREEK CRT, PITTSBURG, CA 94565-7355

(Property Address)

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

The Note provides for an initial interest rate of        7.950%        . The
Note provides for changes in the interest rate and the monthly payments, as follows:

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first day of  May 01     2008       ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a
"Change Date."
### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an index. The "Index" is the
average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.
### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
    SIX AND 30/100                    percentage point(s) ( 6.300%   )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth
of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX - Single Family
Page 1 of 3                                                    USRI0021 (02-23-99)

109505

109505

Loan Number: 581008184     Servicing Number: 002128925-1     Date: 04/03/06

be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.950% or less than 7.950% . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than 13.950% or less than 7.950%

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

USRI0022 (02-23-99)

109505

Loan Number: 581008184     Servicing Number: 002128925-1     Date: 04/03/06

      BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)      _____(Seal)
REY   TABONES                       FELOMENA  TABONES

_____(Seal)      _____(Seal)

_____(Seal)      _____(Seal)

109505

43117144 -409 -FS

EXHIBIT "A"

Legal Description

All that certain real property situated in the City of Pittsburg, County of Contra Costa, State of California, described as follows:

LOT 59, AS SHOWN ON THE MAP OF SUBDIVISION 7843, FILED JULY 11, 1995, MAP BOOK 380, PAGE 33, CONTRA COSTA COUNTY RECORDS.

EXCEPTING THEREFROM:

1. -MINERAL RIGHTS RESERVED IN THE DEED FROM LESTER C. PRAMBERG, ET AL, RECORDED MARCH 13, 1964 IN BOOK 4573 OF OFFICIAL RECORDS, PAGE 678, AND RE-RECORDED MARCH 19, 1964 IN BOOK 4577 OF OFFICIAL RECORDS, PAGE 200, AS FOLLOWS:

"AN UNDIVIDED 1/2 INTEREST IN AND TO ALL OIL, GAS, CASINGHEAD GASOLINE AND HYDROCARBON AND MINERAL SUBSTANCES BELOW A POINT 500 FEET BELOW THE SURFACE OF SAID LAND, TOGETHER WITH THE RIGHT TO TAKE, REMOVE, MINE AND DISPOSE OF ALL SAID OIL, GAS, CASINGHEAD GASOLINE AND OTHER HYDROCARBON AND MINERALS BUT WITHOUT ANY RIGHT WHATSOEVER TO ENTER UPON THE SURFACE OF SAID LAND OR ANY PART OF SAID LAND WITHIN 500 FEET OF THE SURFACE THEREOF."

2. -RIGHTS RESERVED IN THE DEED FROM WEST COAST HOME BUILDERS, INC., A CALIFORNIA CORPORATION, RECORDED SEPTEMBER 24, 1998, SERIES NO. 98-232151, OFFICIAL RECORDS, AS FOLLOWS:

(A) -"ALL MINERALS, AND ANY REMAINING INTEREST IN AND TO ALL OIL, GAS, CASINGHEAD GAS, ASPHALTUM AND OTHER HYDROCARBONS AND ALL CHEMICAL GAS NOW OR HEREAFTER FOUND, SITUATED OR LOCATED IN ALL OR ANY PORTION OF THE LANDS DESCRIBED HEREIN LYING MORE THAN FIVE HUNDRED FEET BELOW THE SURFACE THEREOF, TOGETHER WITH THE RIGHT TO SLANT DRILL FOR AND REMOVE ALL OR ANY OF SAID OIL, GAS, CASINGHEAD GAS, ASPHALTUM AND OTHER HYDROCARBONS AND CHEMICAL GAS LYING BELOW A DEPTH OF MORE THAN FIVE HUNDRED FEET BELOW THE SURFACE THEREOF, BUT WITHOUT ANY RIGHT WHATSOEVER TO ENTER UPON THE SURFACE OF SAID LANDS OR UPON ANY PORTION THEREOF WITHIN FIVE HUNDRED FEET VERTICAL DISTANCE BELOW THE SURFACE THEREOF."

109505

(B) "GRANTOR RESERVES UNTO ITSELF, ITS SUCCESSORS AND ASSIGNS, ALL THE SUBSURFACE WATER NOW OR HEREAFTER FOUND, LOCATED IN ALL OR ANY PART OF THE LAND ABOVE DESCRIBED, LYING BELOW THE SURFACE THEREOF, EXPRESSLY RESERVES THE RIGHT TO GRANT LEASES FOR SUCH WATER WITHOUT RIGHT TO ENTER UPON THE SURFACE OF SAID LAND FOR THE PURPOSE OF RECOVERING SUCH WATER."

097-490-040

End of Document

Exhibit B



# CERTIFIED SECURITIZATION ANALYSIS

446 Old County Road
Pacifica, CA 94044
*www.securitizationanalysis.com*

---

# MORTGAGE SECURITIZATION AUDIT & ANALYSIS REPORT
## September 28, 2012

---



### Prepared for:
## Rey and Felomena Tabones

### 30 Pine Creek Court
### Pittsburg, CA 94565

---

**Disclosure:** You have engaged Certified Securitization Analysis (CSA) to examine your real estate documents. This information is not to be construed as legal advice or the practice of law, pursuant to *Business and Professions Code § 6125 et seq*, it is the intent of CSA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "*...the doing and/or performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court.*"

---

# Table of Contents

SECTION I: BORROWER(S) AND LOAN INFORMATION .................................................................. 3
    Borrower(s) and Property Information ........................................................................3
    Original Mortgage Loan Transaction Summary .........................................................3
    Original Loan/Mortgage Transaction Parties.............................................................4

SECTION II: MORTGAGE SECURITIZATION ............................................................................ 5
    The Securitization Transaction..................................................................................5
        Introduction ........................................................................................................ 5
        The Origins of Mortgage Securitization ............................................................. 6
        Mortgage Securitization by Public and Private Label Placements.......................... 6
        The Borrower (Mortgagor) and the Originating Lender (Mortgagee)...................... 7
        The Securitization Parties and Their Roles ....................................................... 12
        Real Estate Mortgage Investment Conduits ("REMICS") .................................. 16
        Standing in the Event of Mortgage Default ....................................................... 17
        Maintaining a Valid Lien on a Securitized Mortgage.......................................... 18
        Proper Securitization Process/Transaction Flow Chart (Maintaining a Valid Lien) .............................. 19
    Forensic Audit - Mortgage Loan Securitization ........................................................20
    Securitization Participants Identified .......................................................................22
        Simplified Flow Chart of a Proper Process of Securitization .............................. 23
        The Feeding Frenzy Period for Mortgage Securitization (2002 to Early 2008) .................... 38
        The Subverted Securitization Process ............................................................... 39
        The Legal Issues............................................................................................... 40
        Subverted Securitization Process/Transaction Flow Chart.................................. 41
        Role of the Loan Servicer................................................................................. 42
        The Servicing Process Flow Chart .................................................................... 42

SECTION III: FORECLOSURE PROCESS REVIEW ....................................................................44
    Chain of Title Review...............................................................................................44
        Mortgage Loan Documents and Foreclosure Process Review ........................... 45
        Mortgage Securitization Review ...................................................................... 55

SECTION IV: DEFECTS AND DEFICIENCIES, CONCLUSION ....................................................57
    Loan Modification ...................................................................................................57
    Mortgage Securitization Issues ...............................................................................57
    Foreclosure Action Deficiencies & Defects..............................................................58
    Conclusion ..............................................................................................................60
    APPENDIX OF RECENT COMMENTARY ..................................................................................63

# SECTION I: BORROWER(s) AND LOAN INFORMATION

## Borrower(s) and Property Information

| BORROWER(s) | |
|---|---|
| **Rey and Felomena Tabones** | |
| CURRENT ADDRESS | SUBJECT ADDRESS |
| **30 Pine Creek Court Pittsburg, CA 94565** | **30 Pine Creek Court Pittsburg, CA 94565** |

## Original Mortgage Loan Transaction Summary

| | | | |
|---|---|---|---|
| Loan Amount: | **$704,000.00** | Initial Interest Rate (2-Yr. Fixed) | **7.950 %** |
| Origination Date: | **April 3, 2006** | Interest Rate Change Date: | **May 1, 2008** *(Then every 6th month thereafter)* |
| Loan Maturity Date: | **May 1, 2036** | | |
| Loan Program: *(2-Yr. Fixed/28-Yr. ARM)* | **Fixed/Adjustable Rate Note** | Lifetime Cap: | **13.950 %** |
| Loan Rider: | **Adjustable Rate Rider** *(Interest Only Payment for First 10 Years)* | Index Margin: | **6.300 %** |
| | | Index: | **6-Month LIBOR** |
| Initial Monthly Payment: | **$5,141.19** *(Beginning: June 1, 2006)* | Original LTV: | **79.9 %** |
| | | Amortization LTV: | **81.2 %** |
| Pay Change Date: *(Then every 12th month thereafter)* | **May 1, 2011** | First Change Date Rate Cap: | **10.950 %** |
| Occupancy: | **Primary-Residential** | Orig. Loan Number: | **581008184** |
| Loan Purpose: | **Equity Take-Out** | Homeward Residential Account Number: | **0021289251** |
| Property Type: | **Single Housing** | FICO Score: *(at Loan Origination)* | **519** |

---

## Original Loan/Mortgage Transaction Parties

| ORIGINAL LENDER | ORIGINAL LOAN SERVICER | MORTGAGEE/BENEFICIARY |
|---|---|---|
| **OPTION ONE MORTGAGE CORP.** | **OPTION ONE MORTGAGE CORP.** *(Original Servicer)* <br><br> **AMERICAN HOME MORTGAGE SERVICING, INC.** *(Successor Servicer)* | **OPTION ONE MORTGAGE CORP.** |
| BROKER | MORTGAGE TRUSTEE | CURRENT LOAN SERVICER |
| **UNKNOWN** | **PREMIER TRUST DEED SERVICES, INC.** | **HOMEWARD RESIDENT1AL, INC.** |

# SECTION II: MORTGAGE SECURITIZATION

## The Securitization Transaction

### Introduction

Mortgage securitization is a financial transaction whereby hundreds of mortgage loans are pooled together and converted into securities. The loans are collected and packaged by a securitization "Sponsor" and sold to a "Depositor" who in turn sells and transfers these loans into a tax-advantaged trust entity, which is a special purpose vehicle (SPV) that holds the mortgage loans as collateral on the securities traded and sold by Wall Street and other firms to investors. The securitized mortgages held in the mortgage-backed securities (MBS) trust entity are rated and classified in "tranches" (with each tranche representing a different level of risk & return.) The investors ("Certificate Holders") purchase the rights to cash generated from the borrowers' (mortgagors') principal and interest payments of the loans.

With securitization of the mortgages, the "Originating Lenders" are then able to take these loans (a non-liquid asset) off their books, eliminating the need to maintain the required capital reserves for contingency against default.



MORTGAGE SECURITIZATION

## The Origins of Mortgage Securitization

Beginning in the early 1970s, the first mortgage-backed securities were created and offered as a way for the government and government sponsored entities (GSE) such as the Government National Mortgage Association (GNMA or Ginnie Mae), the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac), and the Federal National Mortgage Association (FNMA or Fannie Mae) to provide greater liquidity to the residential markets and promote American homeownership. Freddie Mac and Fannie Mae followed suit in an effort to create deeper mortgage markets. Investors were attracted to purchasing these insured mortgage pool certificates than investing in (buying) individual home loans, which would require a more complex and expensive operation than ownership of financial securities requires.

Among the reasons such new innovation in financing (securitization) added greater liquidity to the market is that the mortgage and asset-backed securities financial structure allowed investors with different risk tolerance to choose different rates of return as well as options in timing of receipt of investment income (principal repayment & interest.) The securitization vehicle, a mortgage-backed securities trust (MBS trust) receiving pass-through income is typically structured such that a certain group of investors (certificate holders) receives a lower rate of income, but in exchange, is not exposed to first losses incurred in the event of mortgage default. Other investors with an interest in the same securitized mortgage pool may bear the first loss position in exchange for higher income from the schedule mortgagor's (borrower's) payments received by the MBS trust. The cash flows from the pooled mortgages securing the MBS trust income are thus aggregated, and then re-divided into "tranches" owing to each class of bond issued by the Trust, each with a rating by independent credit rating agencies such as Moody's, Fitch and Standard & Poor's.

Fast forward to the present date, the market for mortgage and asset-backed securities has grown significantly to a size surpassing even the U.S. Treasury Market ($4 trillion) and all corporate bonds ($3.1 trillion). The mortgage-backed securities market is the largest segment of the U.S. bond market with approximately $4.6 trillion in mortgage-related debt outstanding in 2007 and an additional $1.5 trillion of asset-backed securities outstanding, the majority of which are backed by home equity loans.

## Mortgage Securitization by Public and Private Label Placements

Mortgage securitization may be issued by public and/or private entities. Public placements are originated by Government Sponsored Entities (GSE) such as Fannie Mae, Freddie Mac and Ginnie Mae and normally involve a single form of an investment bond called Pass-Through Certificates. Private-label placements represent mortgages that have been aggregated on the secondary market by private investors and are done in tranches to represent the varying levels of risks associated with them.

## The Borrower (Mortgagor) and the Originating Lender (Mortgagee)

The market for financial assets begins with a borrower requesting funds and a lender extending a loan. The relationship between the loan originator and the borrower represents the first necessary step in both conventional lending and the asset-backed securitization process. With the securitization model, the borrowers' previous bilateral relationship with a lender is replaced by the pooling of multiple borrowers' loans, and the ultimate funding of a loan coming from multiple investors as compared to a single lender.

The securitization process starts when a potential borrower needs a loan. The lender funds the loan in exchange for the borrower's contractual promise to pay the loan's principal with interest (promissory note), and the borrower's grant of a security interest in certain collateral, most often the property purchased or refinanced with the loan proceeds (Mortgage or Deed of Trust, depending on the state in which the loan originates. The security instrument in the present case is a Mortgage. For the purposes of the charts in this report, references to Deeds of Trust and Mortgages are interchangeable). See Chart 1 (next page.)



**Chart 1: Transfer of Mortgage from a Borrower to a Lender;
Contracts - Loan Documents between Borrower and Lender**

Thereafter (Chart 2), the lender sells/transfers pooled mortgages to a "Purchaser," who may be the securitization "Sponsor," usually an affiliate company of the lender or an investment bank. The Purchaser may also purchase other loans from other lenders, benefiting from significant economies of scale, with a typical MBS trust composed of thousands of pooled mortgage loans worth $500 million to more than $1 billion.



**Chart 2: Transfer of Mortgages from Lender to Purchaser; Contracts - Mortgage Loan Purchase Agreement (MLPA) & Interim Service Agreement (ISA) between the Lender and Purchaser**

The following are the advantages and benefits to the originating lender packaging and selling pooled mortgages using the structure of a securitization:

1. Immediate liquidity on otherwise illiquid assets such as 30-year mortgages.
2. Maximize the amount obtained from selling and transferring the mortgages and immediately realize the profits.
3. Avoid, often through associated credit default insurance, carrying on the lender-transferor's balance sheet reserves and contingent liability, thereby escaping any reserve requirements imposed upon contingent liabilities that would otherwise be carried on the transferor's books.
4. Use the liquid funds to enter into new loan transactions and to earn more profits that are immediately realized... again and again (as well as the profits, fees and charges associated with the new transactions... and so on.)
5. Insulate the lender-transferor from liability and moves the liability to the insurers.
6. Maximize earnings by transferring the assets so that the assets cannot be reached by the creditors of the transferor institution or by the trustee in the event of the originator's bankruptcy. (By being *"bankruptcy-remote"* the value to investors of the illiquid assets is increased and investors are willing to pay more.)
7. Control management of the illiquid asset by being appointed as the servicer of the mortgage and earn service fees.
8. Increase the value of the Trust securities through their issuance by a tax-free pass-through Trust entity so that only the investor who receives income from the Trust is taxed. This avoids "double taxation" of both the trust and the investor.
9. Leverage the mortgage transaction by creating mortgage-backed certificates that can be pledged as an asset, which can be re-securitized and re-pledged to create new financial securities [collateralized debt obligations or CDOs] secured by the cash flows not of the loans,

but of the MBS whose cash flows are derive from them.

The loan originator/originating lender typically sells the pooled loans under a **Mortgage Loan Purchase Agreement (MLPA)**, which contains warranties and representations on the loans sold. Between the sale date of the loan and the closing date of the securitization transaction, the lender will agree to continue to "service" (collect upon) the loan. Either the MLPA or an Interim Service Agreement (ISA) provides for this interim servicing arrangement. The lender expressly acknowledges that the Purchaser is buying these mortgages for the purpose of securitization. The borrower's commitment to repay the loan and the lender's security backing the loan will be evidenced by loan documents namely the mortgage and a note.

The Purchaser (often along with other purchasers) sells loans to the "Depositor", a *bankruptcy-remote entity* setup for the purpose of "depositing" loans in a securitization trust. The Depositor buys loans from each purchaser under a further MLPA between purchaser and depositor. The Purchaser-Depositor MLPA [in this instance, the agreement is entitled the Mortgage Loan Sale and Assignment Agreement ["MLSAA"]] may or may not assign the rights under the lender-purchaser MLPA. The lender and/or the Purchaser also provides the Depositor with indemnity for prospectus information and warranting/representing "truthfulness of information," and the depositor then places such information and indemnities in the prospectus (and prospectus supplement) or other offering documents.



**Chart 3: Transfer of Mortgages from Purchaser to Depositor; Contracts - MLPA between the Purchaser and Depositor**

After buying the loans from the purchaser(s), the depositor holds the loans (for a "split second") before depositing the loans into an issuer securitization trust. Using a "shelf registration," the Depositor has often filed a prospectus describing the securitization practices. Then, for each subsequent securitization, the Depositor files a prospectus supplement describing that specific securitization transaction. These offering documents describe the securitization transaction parties, the classes of bond certificates to be issued, the yield on the various tranches/classes of certificates, the loan pool, the trust administration, and certain legal matters. (See Chart 4.) The MLPA representations and warranties may also be stated in the one or more offering documents. **The Pooling and Servicing Agreement (PSA)**, which is the operative legal contract that creates the MBS Trust and governs its terms, operation and administration, provides for the transfer of the loans on a specified closing date. The PSA repeats the key MLPA terms or provisions, or set out other terms relevant to the MLPA.



**Chart 4: Depositor "depositing" pooled loans/mortgages to an Issuer Trust for loan pool; Depositor prepares Prospectus (& Supplemental Prospectus); Contracts - Pooling and Service Agreement (PSA) between the Loan Servicer, Depositor and Trust**

The MBS trust created by the Purchaser for the issuer is called a **Special Purpose Vehicle (SPV).** The SPV is organized to be a **Qualified Special Purpose Entity (QSPE)**, which receives a favorable "pass-through" or single tax treatment based on strict IRS rules. To avoid the double taxation of the trust and the certificate holders (multiple investors who purchased the bond certificates from the trust), the trust is classified as a **Real Estate Mortgage Investment Conduit (REMIC)**, a category of QSPE. Upon

qualification as a REMIC, the income of the trust (scheduled mortgagors' payments) is taxed only at the Certificate Holders' (Investors') level.



**Chart 5: Depositor "depositing" pooled loans/mortgages to an Issuer Trust for loan pool;
Depositor prepares Prospectus (& Supplemental Prospectus);
Contracts - PSA between the Loan Servicer, Depositor and Trust.**

The PSA provides for the trust administration through the Trustee and Servicer. The SPV or the trust transfers the right to service the collection of income from the pooled assets to a third party or in most cases to the loan originator/originating lender itself. The Servicer collects borrower obligations on the loans subsequent to the securitization closing date on behalf of the trustee. The rights to service the mortgage loans are called Mortgage Servicing Rights or MSR. The rights to service mortgage assets are also considered as assets with recognized value. The Trustee is the nominal legal owner of the trust assets for the benefit of the investors (Certificate Holders.)

## SECURITIZATION PARTICIPATIONS



**Chart 6: Securitization Participants (total picture)**

## The Securitization Parties and Their Roles

(Note: The name of the Securitization Participants in this specific case in all caps is underlined)

1. **Loan Originator/Originating Lender**. OPTION ONE MORTGAGE CORPORATION. The "originator" is the lender that provided the funds to the borrower (mortgagor) at loan closing or close of escrow. Usually the originator is the named "Lender" (mortgagee) in the Promissory Note and in the security instrument (Mortgage or Deed of Trust.)  Majority of lenders/originators securitize loans because of the numerous advantages and benefits previously mentioned.

2. **Warehouse Lender**. The Originator probably borrowed the funds on a line of credit from a short-term revolving warehouse credit facility (commonly referred to as a "warehouse lender"); nevertheless the money used to close the loan were technically and legally the Originator's funds. Warehouse lenders are either "wet" funders or "dry" funders. A wet funder will advance the funds to close the loan upon the receipt of an electronic request from the originator. A dry funder, on the other hand, will not advance funds until it actually receives the original loan documents duly executed by the borrower.

3. **Securitizer: Sponsor, Aggregator or Seller**. OPTION ONE MORTGAGE CORPORATION. The Sponsor is the party that securitizes the pool of mortgage loans. This means that it was the final aggregator of the loan pool and then sold the loans directly to the Depositor, which in turn sold them to the securitization

trust. In order to obtain the desired ratings from the independent ratings agencies such as S&P, Moody's or Fitch, the Sponsor normally is required to retain some exposure to the future value and performance of the loans in the form of purchases of the most deeply subordinated classes of the securities issued by the Trust, i.e., the classes last in line for distributions and first in line to absorb losses (commonly referred to as the "first loss pieces" of the deal.)

4. **Depositor**. FINANCIAL ASSET SECURITIES CORPORATION. The Depositor exists for the sole purpose of enabling the transaction to have the key elements that make it a securitization in the first place: a "true sale" of the mortgage loans to a "bankruptcy-remote" and "FDIC-remote" purchaser. The Depositor purchases the loans from the Sponsor, sells the loans to the Trustee of the securitization trust, and uses the proceeds received from the trust to pay the Sponsor for the Depositor's own purchase of the loans. It all happens simultaneously, or as nearly so as theoretically possible. The length of time that the Depositor owns the loans has been described as "one nanosecond."

The Depositor has no other functions, so it needs no more than a handful of employees and officers. Nevertheless, it is essential for the "true sale" and "bankruptcy-remote"/"FDIC-remote" analysis that the Depositor maintains its own corporate existence separate from the Sponsor and the Trust and observes the formalities of this separate corporate identity at all times. The "Elephant in the Room" in all structured financial transactions is the mandatory requirement to create at least two "true sales" of the notes and mortgages between the Originator and the Trustee for the Trust so as to make the assets of the Trust both "bankruptcy" and "FDIC" remote from the originator. And, these "true sales" will be documented by representations and attestations signed by the parties; by attorney opinion letters; by asset purchase and sale agreements; by proof of adequate and reasonably equivalent consideration for each purchase; by "true sale" reports from the three major "ratings agencies" (Standard & Poor's, Moody's, and Fitch) and by transfer and delivery receipts for mortgage notes endorsed in blank.

5. **Trustee**. DEUTSCHE BANK NATIONAL TRUST COMPANY. The Trustee is the nominal owner of the loans on behalf of the Certificate Holders (Investors) at the end of the securitization transaction. Like any trust, the Trustee's powers, rights, and duties are defined by the terms of the transactional documents that create the trust, and are subject to the terms of the trust laws of some particular state, as specified by the "Governing Law" provisions of the transaction document that created the trust. The vast majority of the residential mortgage backed securitized trusts are subject to the applicable trust laws of Delaware or New York. The "Pooling and Servicing Agreement" (or, in "Owner Trust" transactions as described below, the "Trust Indenture") is the legal and governing document that creates these common law trusts and the rights and legal authority granted to the Trustee is no greater than the rights and duties specified in this Agreement. The Trustee is paid based on the terms of each structure. For example, the Trustee may be paid out of interest collections at a specified rate based on the outstanding balance of mortgage loans in the securitized pool; the Master Servicer may pay the Trustee out of funds designated for the Master Servicer; the Trustee may receive some on the interest earned on collections invested each month before the investor remittance date; or the Securities Administrator may pay the Trustee out of their fee with no charges assessed against the Trust earnings. Fee amounts range between a low of .0025% to as high as .009%.

6. **Indenture Trustee and Owner Trustee**. Most private-label securitizations are structured to meet the

Internal Revenue Code requirements for tax treatment as a "Real Estate Mortgage Investment Conduit ("REMIC.") However some securitizations (both private-label and Government Sponsored Enterprises or GSEs) have a different, non-REMIC structure usually called an "Owner Trust." In an Owner Trust structure the Trustee roles are divided between an Owner Trustee and an Indenture Trustee. As the names suggest, the Owner Trustee owns the loans; the Indenture Trustee has the responsibility of making sure that all of the funds received by the Trust are properly disbursed to the investors (bond holders) and all other parties who have a financial interest in the securitized structure. These are usually Delaware statutory trusts, in which case the Owner Trustee must be domiciled in Delaware.

7. **Primary (or Sub- Servicer)**. OPTION ONE MORTGAGE CORPORATION. The Primary Servicer services the loans on behalf of the Trust. Its rights and obligations are defined by a loan-servicing contract, usually located in the Pooling and Servicing Agreement in a private-label (non-GSE) deal. The trust may have more than one servicer servicing portions of the total pool, or there may be "Secondary Servicers," "Default Servicers," and/or "Sub-Servicers" that service loans in particular categories (e.g., loans in default.) Any or all of the Primary, Secondary, or Sub-Servicers may be a division or affiliate of the Sponsor; however under the servicing contract the Servicer is solely responsible to the Trust and the Master Servicer. (See next paragraph.) The Servicers are the legal entities that do all the day-to-day "heavy lifting" for the Trustee such as sending monthly bills to borrowers, collecting payments, keeping records of payments, liquidating assets for the Trustee, and remitting net payments to the Trustee.

The Servicers are normally paid based on the type of loans in the Trust. For example, a typical annual servicing fee structure may be: .25% annually for a prime mortgage; .375% for an Alt-A or Option ARM; and .5% for a subprime loan. In this example, a subprime loan with an average balance over a given year of $120,000 would generate a servicing fee of $600.00 for that year. The Servicers are normally permitted to retain all "ancillary fees" such as late charges, check by phone fees, and the interest earned from investing all funds on hand in overnight US Treasury certificates (sometimes called "interest earned on the float.")

8. **Master Servicer**. The Master Servicer is the Trustee's representative for assuring that the Servicer(s) abide by the terms of the servicing contracts. For trusts with more than one servicer, the Master Servicer has an important administrative role in consolidating the monthly reports and remittances of funds from the individual servicers into a single data package for the Trustee. If a Servicer fails to perform or goes out of business or suffers a major downgrade in its servicer rating, then the Master Servicer must step in, find a replacement and assure that no interruption of essential servicing functions occurs. Like all servicers, the Master Servicer may be a division or affiliate of the Sponsor but is solely responsible to the Trustee. The Master Servicer receives a fee, small compared to the Primary Servicer's fee, and based on the average balance of all loans in the Trust.

9. **Custodian**. WELLS FARGO BANK, N.A. .The Master Document Custodian (MDC) takes and maintains physical possession of the original hard-copy Mortgage Notes, Deeds of Trust, the assignments, sales and purchase agreements and certain other "key loan documents" that the parties deem essential for the enforcement of the mortgage loan in the event of default. The MDC must also execute representations and attestations that all of the transfers really and truly occurred "on time" and in the required "order" and that "true sales" occurred at each link in the chain.

- This is done for safekeeping and also to accomplish the transfer and do the negotiation for the possession of the Notes that is essential under the Uniform Commercial Code for a valid transfer to the Trustee to occur.
- Like the Master Servicer, the Master Document Custodian is responsible by contract solely to the Trustee (e.g., the Master Document Custodial Agreement.) However, unlike the Master Servicer, the Master Document Custodian is an institution wholly independent from the Servicer and the Sponsor.
- There are exceptions to this rule in the world of Fannie Mae/Freddie Mac ("GSE") securitizations. The GSE's may allow selected large originators with great secure storage capabilities (in other words, large banks) to act as their own Master Document Custodians. But even in those cases, contracts make clear that the GSE Trustee, not the originator, is the nominal owner of the Note and the mortgage loan.
- The Master Document Custodian must review all original documents submitted into its custody for strict compliance with the specifications set forth in the Custodial Agreement, and deliver exception reports to the Trustee and/or Master Servicer as to any required documents that are missing or fail to comply with those specifications.
- In so doing the Custodian must in effect confirm that for each loan in the Trust there is a "complete and unbroken chain of transfers and assignments of the Notes and Mortgages."
- This does not necessarily require the Custodian to find assignments or endorsements naming the Depositor or the Trustee. The wording in the Master Document Custodial Agreement must be read closely. Defined terms such as "Last Endorsee" may technically allow the Custodian to approve files in which the last endorsement is from the Sponsor in blank, and no assignment to either the Depositor or the Trustee has been recorded in the local land records.
- In many private-label securitizations a single institution fulfills all of the functions related to document custody for the entire pool of loans. In these cases, the institution might be referred to simply as the "Custodian" and the governing document as the "Custodial Agreement."

## Real Estate Mortgage Investment Conduits ("REMICS")

The Tax Reform Act of 1986 established the legal basis of REMICs (100 Stat. 2085, 26 U.S.C.A. §§ 47, 1042), which eliminated double taxation of these securities. The principal advantage of forming a REMIC for the sale of mortgage-backed securities (MBS) is that the REMIC is treated as pass-through vehicles for tax purposes, avoiding double-taxation.   A REMIC can be structured as an entity (i.e., partnership, corporation, or trust) or simply as a segregated pool of assets, so long as the entity or pool meets certain requirements regarding the composition of assets and the nature of the investors' interests. No tax is imposed at the REMIC level. To qualify as a REMIC, all of the interests in the REMIC must consist of one or more classes of "regular interests" and a single class of "residual interests." Regular interests can be issued in the form of debt, stock, partnership interests, or trust certificates, or any other form of securities, but must provide the holder the unconditional right to receive a specified principal amount and interest payments. REMIC regular interests are treated as debt for federal tax purposes. A residual interest in a REMIC, which is any REMIC interest other than a regular interest, is, on the other hand, taxable as an equity interest.

In most mortgage-backed securitizations, the owner of a pool of mortgage loans (usually the Sponsor) sells and transfers such loans to a QSPE, usually a trust, that is designed specifically to qualify as a REMIC, and simultaneously, the QSPE issues securities that are backed by cash flows generated from the transferred assets to investors in order to pay for the loans along with a certain return. If the special purpose entity qualifies as a REMIC, then any income of the QSPE is "passed through" and, therefore, not taxable until the income reaches the holders of securities issued by the REMIC, also known as beneficiaries of the REMIC trust.

**Accordingly, it can be argued that the trustee, the QSPE, and the other parties servicing the trust, have no legal or equitable interest in the securitized mortgages. Therefore, it can be further asserted that any servicer who alleges that they are, or that they have the right or have been assigned the right to claim, that they are the holder of the note for purposes of standing to bring an action of foreclosure, is stating a legal nullity.** Any argument containing such an allegation by the servicer would be questionable on this basis. Of course, that is exactly what the servicer of a securitized mortgage purported to be in default claims. The same is the case when a lender makes that same claim.  The party shown as "Lender" on the mortgage note was instrumental in the sale and issuance of the certificate-to-certificate holders, which means the lender(s) knew that they were not any longer the holder of the note.

The QSPE is a weak repository and is not engaged in active management of the assets and so, a servicing agent is appointed. **Moreover, all legal and equitable interest in the mortgages is required by the REMIC to be passed through to the certificate holders.  Compliance with the legal limitations on REMICs and insulating the trust assets from creditors of third parties (who create or service the trust) leads to unilateral restructuring of the terms and conditions of the original note and mortgage.**

A typical mortgage pool consists of anywhere from 2,000 to 5,000 loans. This represents millions of dollars in cash flow payments each month from a servicer (receiving payments from borrowers) to a REMIC (QSPE) with the cash flow "passing through", tax-free, to the beneficiaries of the trust

(investors.) Those proceeds are not taxed until received as income to the investors. Only the investors have to pay income taxes on the payments of mortgage interest received.

**TO EMPHASIZE AGAIN, in order for one of these investment trusts to qualify for the "pass through" tax benefit of a REMIC, ALL LEGAL AND EQUITABLE INTEREST IN THE MORTGAGES HELD IN THE NAME OF THE TRUST ARE VESTED IN THE INVESTORS, not in anyone else AT ANY TIME. If legal and/or equitable interest in the mortgages held in the name of the trust is claimed by anyone other than the investors, those that are making those misrepresentations are either defrauding the investors, or the homeowners & courts, or both.**

So, if the trust, or a servicer, or a trustee, acting on behalf of the trust, is found to have violated the very strict REMIC guidelines (put in place in order to qualify as a REMIC), the "pass through" tax status of the REMIC can be revoked.

According to **Section 860 of the Internal Revenue Code**, in order for an investment entity to qualify as a REMIC, all steps in the "contribution" and transfer process (of the notes) **must be true and complete sales between the parties and must be accomplished within the three month time limit from the date of "startup" of the entity.** Therefore, every transfer of the note(s) must be a true purchase and sale, and, consequently the note must be endorsed from one entity to another. Any mortgage note/asset identified for inclusion in an entity seeking REMIC status must be sold into the entity within the three-month time period calculated from the official startup day of the REMIC. Any procedural defect relating to endorsement, notarization, assignment of rights, and recordation renders foreclosure action on the loan asset on behalf of the REMIC vulnerable to stay of foreclosure, and possible dismissal through absence of proper standing to proceed.

## Standing in the Event of Mortgage Default

Before securitization, the holder of an enforceable note has a financial responsibility for any losses that may occur arising from a possible default, which means that holder also has the authority to take steps to avoid any such losses (the right to foreclose.) Securitization, however, effectively severs such financial responsibility for losses.

With securitization the mortgage is converted into something different from what was originally represented to the mortgagor/homeowner. For one thing, since the party (or parties) taking action to foreclose does not actually hold any legal or equitable interest in any securitized mortgage, they have not realized any loss or damages resulting from the purported default. Therefore, it also follows that the foreclosing party avoids the liability, which could result if a class of certificate holders claimed wrongful injury resulting from a modification made to achieve an alternate dispute resolution.

Securitization also makes the mortgage and note unalienable. The reason is simple: once certificates have been issued, the note cannot be transferred, sold or conveyed; at least not in the sense that such a transfer, sale, or conveyance should be considered lawful, legal, and legitimate. This is because the securitized note forever changes the nature of that instrument in an irreversible manner. It might appear that the inability to alienate the note has no adverse consequences for the debtor, but recent

history disproves this notion. Several legislative and executive efforts to pursue alternative dispute resolution and to provide financial relief to distressed homeowners have been thwarted by the inability of the United States government to buy securitized mortgages without purchasing most of the certificates issued.

An SPV cannot sell any individual mortgage because the certificate holders do not hold mortgages individually; the certificate holders own the thousands of mortgages held in the name of the REMIC collectively. Likewise, the certificate holders cannot sell the mortgages. All the certificate holders have are the securities, each of which can be publicly traded. The certificate holders are, in no sense, holders of any specific individual note and have no legal interest in any specific individual note. The certificate holders do not each hold undivided fractional interests in a note, which added together, total 100%. The certificate holders also are not the assignees of one or more specific installment payments made pursuant to the note.

For the certificate holder, there is no note. A certificate holder does not look to a specific note for their investment's income payment. Instead, the certificate holder holds a security to a bond with specific defined payments. The issuer of trust certificates is selling segments of cash flow. The concept of securitization is brilliant. It began as a simple idea; a way to convert illiquid, long term debt into liquid, tradable short-term debt. It cashes out the lender, allowing the lender to make new "loans" while realizing an immediate profit on the notes sold.

## Maintaining a Valid Lien on a Securitized Mortgage

To visually frame the complete picture relating to the required legal processes associated with securitization, Chart 7 herein shows and follows the flow of the required proper assignments and actual possession of the mortgagor's original "wet ink" Promissory Note and Deed of Trust (Security Instrument assignment, equivalent to a Mortgage) for a party enforcing foreclosure action against the borrower. Such a borrower may succeed in delaying or stopping legal action by the foreclosing party by having the court examine the standing of the foreclosing party and that party's records and procedures.

The procedure for selling of the loans was to create a situation whereby certain REMIC tax laws were observed, and whereby the Issuing Entity and the Lender would be protected from issues regarding either entity going into bankruptcy. For the MBS Trust to acquire this protection from Lender and Issuer bankruptcy, two "True Sales" of the loans had to occur, when loans were transferred to different entities. A "True Sale" of the loan would be a circumstance whereby one party owned the Note, and then sold it to another party. An offer would be made, and then accepted, with compensation given to the "seller" in return for the Note. The Notes would be transferred, and the security instruments (Mortgages or Deeds of Trust) "assigned to the buyers" of the Note, with an Assignment made every step of the way, and each Note endorsed to the next party.

At least in theory, that is how the process would work. Chart 7 outlines the proper process to maintain a valid lien, one that would permit a servicer of an MBS Trust to foreclose on a borrower in purported default.

## Proper Securitization Process/Transaction Flow Chart (Maintaining a Valid Lien)



**NOTE:** MBS Trust qualification as a "REMIC" Trust allows favorable "pass-through" taxation of MBS Trust income

Copyright November 2010 by Lawrence M. Asuncion
"All Rights Reserved"

**Chart 7: Flow Chart Showing Proper Assignments to Maintain a Valid Lien in a Securitized Mortgage**

# Forensic Audit - Mortgage Loan Securitization

CSA auditing reviewed the subject mortgage loan to determine if the original lender, **OPTION ONE MORTGAGE CORPORATION** (hereinafter "**OPTION ONE**") sold it in the secondary market for securitization. It was noted that:

* OPTION ONE, the original lender in the Promissory Note ("Note") and Deed of Trust ("DOT"), originated the subject mortgage loan on April 3, 2006 with PREMIER TRUST DEED SERVICES, INC. (hereinafter "PTDS"), as Trustee under the Deed of Trust ("DOT.") However, MERS was not referenced in the Note in any capacity.

### About OPTION ONE MORTGAGE CORPORATION ("OPTION ONE")

The company was founded in 1992 and was headquartered in Irvine, California. It also operated offices in Jacksonville and Florida. OPTION ONE, a division of H&R BLOCK, was the fourth largest mortgage servicer in the nation, servicing about $53 billion of subprime mortgages. The company originates and acquires residential mortgage products through a national network of brokers and lenders. OPTION ONE also services, and sells residential mortgage loans in the secondary market for securitization.

OPTION ONE was among the first of the subprime participants to admit problems with its portfolio and ultimately generated million of dollars in losses. At the time its troubles became public it has agreed to be acquired by Cerberus Capital Management but both sides agreed to terminate their deal as conditions continue to deteriorate. H&R BLOCK has announced that it was shutting down OPTION ONE.

On April 30, 2008 Billionaire *Wilbur Ross* acquired OPTION ONE through AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMSI.") Ross is known as a distressed asset investor who acquired $42 billion in mortgage servicing rights from the parent company of AHMSI, the AMERICAN HOME MORTGAGE INVESTMENT CORPORATION ("AHMIC.") The proceeds from the OPTION ONE/Ross deal was primarily used to payoff some $700 million in OPTION ONE debt.

* It is well known that almost all the major lenders sold majority of their loans during the frenzied period of mortgage securitization from 2002 to early-2008. Shortly after loan funding, wholesale lenders (like OPTION ONE) sell mortgages they originate through a securitization structure because of the immediate benefits it provides. Mortgage securitization allows the lender to instantly turn an illiquid asset such as a 30-year loan into liquid asset and immediately earn profits. The lender could then use the liquid funds to enter into new loan transactions and to earn more profits that are immediately realized... again and again (as well as the profits, fees and charges associated with the new transactions... and so on.) In addition, the lender earns monthly fees for servicing the loan from the securitization trust.

* OPTION ONE sold substantially all loans it originated (and/or funded or acquired through its network of mortgage brokers and correspondent lenders) for securitization. Specifically, OPTION ONE's "*30-year 2-Yr Fixed/28-Yr ARM*" loan product (as in the subject mortgage loan) was one of the

main types of mortgage loans that OPTION ONE sold and securitized in the secondary market.

- Given that OPTION ONE sold substantially all its 30-Year 2/28 ARM loan products for securitization, CSA's investigation and forensic mortgage securitization audit focused on all of the SEC filings for mortgage-backed securities trusts ("MBS trusts") formed in 2006 where OPTION ONE was the loan originator, seller, sponsor and servicer in the securitization transaction.

- With the date of the origination of the subject loan on April 3, 2006 on one hand, and on the other, the specified "Cut-off Date" of June 1, 2006 and "Closing Date" on June 19, 2006 of one MBS trusts reviewed where **OPTION ONE** was the **"Seller"**, **"Sponsor"** and **"Servicer"** with **FASC** as **"Depositor"** and **DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC")** as **"Trustee"**, **SOUNDVIEW HOME LOAN TRUST 2006-OPT5, ASSET-BACKED CERTIFICATES, SERIES 2006-OPT5** (hereinafter the **"SVHLT 2006-OPT5"**) easily stands out as the MBS Trust where the subject loan was securitized. The first "Distribution Date" (of income) to the Certificateholders (Investors) of this trust was on July 25, 2006, making it timely for the subject loan's second monthly mortgage payment due date. The **SVHLT 2006-OPT5** was formed as a *Real Estate Mortgage Investment Conduit* ("REMIC") qualified trust with the execution of a governing *Pooling and Servicing Agreement* ("PSA") dated June 1, 2006. The PSA is the operative legal and binding contract governing the terms, operation, administration of the securitization trust, as well as the ownership of the securitized mortgage loans.

- Below is a summary table listing 24 SEC Filings of *Documents and Exhibits* submitted from 5/23/2006 to 3/30/2007 (SEC File # 333-130961-10) by the securitization registrant and depositor **FINANCIAL ASSET SECURITIES CORPORATION** (hereinafter **"FASC"**) for the MBS Trust: **SVHLT 2006-OPT5**. Among others, these SEC filings included: 1) the *Prospectus Supplement* dated 5/24/2006 *[To Prospectus* dated 4/26/2006] filed on 6/20/2006 pursuant to SEC Rule 424(b)(5); 2) the *Free Writing Prospectus* ("FWP") filed on 5/24/2006 pursuant to SEC Rule 163/433; and (3) the governing *Pooling and Servicing Agreement* ("PSA") dated 6/1/2006, which was filed on 7/12/2006 as Form 8-K for 5/24/2006 EX-4.1.

## Securitization Participants Identified

| Original Lender | Original Loan Servicer: | Original Trustee: |
|---|---|---|
| **OPTION ONE MORTGAGE CORPORATION** | **OPTION ONE MORTGAGE CORP.** *(Original Servicer)* <br><br> **AMERICAN HOME MORTGAGE SERVICING, INC.** | **PREMIER TRUST DEED SERVICES, INC.** |
| Beneficiary | Loan Originator and Seller | Loan Servicer/Sub-Servicer |
| **OPTION ONE MORTGAGE CORPORATION** | **OPTION ONE MORTGAGE CORPORATION** | OPTION ONE MORTGAGE CORP. <br><br> HOMEWARD RESIDENTIAL, INC. *(Current Servicer)* |
| Sponsor and Seller | Depositor | Issuing Entity (The "MBS Trust") |
| **OPTION ONE MORTGAGE CORPORATION** | **FINANCIAL ASSET SECURITIES CORPORATION** | **SOUNDVIEW HOME LOAN TRUST 2006-OPT5 ASSET-BACKED CERTIFICATES, SERIES 2006-OPT5** |
| Trustee | Custodian | Underwriter |
| **DEUTSCHE BANK NATIONAL TRUST COMPANY** | **WELLS FARGO BANK, N.A.** | **RBS GREENWICH CAPITAL and WACHOVIA CAPITAL MARKETS, LLC** |

| | |
|---|---|
| **ISSUER TRUST NAME:** | SOUNDVIEW HOME LOAN TRUST 2006-OPT5 TRUST |
| **TITLE OF SERIES:** | ASSET-BACKED CERTIFICATES, SERIES 2006-OPT5 |
| **Subject Loan Date:** | April 3, 2006 |
| **Cut-Off Date:** | June 1, 2006 |
| **Closing Date:** | June 19, 2006 |
| **Distribution Date:** | 25th of each month, beginning in July 2006 |

| | |
|---|---|
| **Aggregate Principal Balance:** | $3,098,773,890 *(Approx., Per Prospectus Supplement dated 5/24/2006)* |
| **Total Mortgage Loans:** | 15,746 |

- Shortly after loan closing, original lender **OPTION ONE MORTGAGE CORPORATION ("OPTION ONE"),** acting as **"Originator", "Seller"** and **"Sponsor"** in a securitization transaction, sold the subject mortgage loan to **FINANCIAL ASSET SECURITIES CORPORATION** (hereinafter **"FASC"**), the securitization Depositor who formed the Mortgage-Backed Securities Trust (MBS Trust): **SOUNDVIEW HOME LOAN TRUST 2006-OPT5, ASSET-BACKED CERTIFICATES, SERIES 2006-OPT5** (hereinafter the **"SVHLT 2006-OPT5."**)

**Simplified Flow Chart of a Proper Process of Securitization**



Chart 8  - Simplified Flow Chart, Proper Securitization Process

## The *Prospectus Supplement [To Prospectus]*

- By cross-referencing of the terms and characteristics of the subject mortgage Note (*See Section I, Page 3 of this report – "Original Loan Transaction Summary" showing the terms and characteristics of the mortgage loan*), it led to a match within the range and parameters of the securitized mortgages described and shown under *"Loan Group II Tables"* in the offering *Prospectus Supplement* dated 5/24/2006 *[To Prospectus* dated 4/26/2006*]* that was issued and filed with the SEC on 6/20/2006 for the SVHLT 2006-OPT5. *See Prospectus Supplement [To Prospectus], which is part of this audit and analysis report as **Exhibit "1"** – specifically, the "Loan Group II Tables" describing in detail the terms and characteristics of the securitized mortgages from 50 to 61 of 222*

*pages of the Prospectus Supplement when downloaded and printed as a PDF file.*

**The *Free Writing Prospectuses* ["FWPs"]**

- A further review of the FWPs confirmed that the subject loan was in fact sold and securitized into the SVHLT 2006-OPT5 on or before the cut-off date of June 1, 2006. In one of the seven FWPs filed with the SEC, the subject loan was identified and initially assigned Trust's Loan No. 10728. It was specifically listed on pages 102, 294, 486 and 1062 of 1154 of the FWP when downloaded and printed as a PDF file. *See a true and correct copy of the FWP (filed with the SEC on 5/24/2006), which is part of this audit and analysis report as **Exhibit "2."***

**The *Mortgage Loan Purchase Agreement* ["MLPA"]**

- The MLPA dated May 24, 2006, which is listed <u>as *Exhibit C* and part of the *Pooling and Servicing Agreement* ("PSA")</u> that was filed with Securities and Exchange Commission (SEC) on July 12, 2006 as Form 8-K EX-4.1, memorialized the <u>absolute sale of the Mortgage Loans</u> (including the subject loan) without recourse between FINANCIAL ASSET SECURITIES CORPORATION ("FASC") as the "Purchaser" and OPTION ONE MORTGAGE CORP. ("OPTION ONE") as the loan "Originator" and "Seller."

- The Seller represented, warranted and covenanted that as of date of the MLPA, OPTION ONE owns the mortgages on the properties securing such Mortgage Loans. The Seller OPTION ONE agreed to sell, and Purchaser FASC agreed to purchase, the Mortgage Loans (approximately 15,746 total loans.) In consideration of the sale of the Mortgage Loans, FASC paid OPTION ONE a total amount equal to <u>$3,099,999,734.48 in immediately available funds</u> on the Closing Date (June 19, 2006.)

- Seller OPTION ONE represented, warranted and covenanted that it transferred, assigned, set over and otherwise conveyed to Purchaser FASC all right, title and interest of the Seller in and to the Mortgage Loans and all Mortgage Files, including all interest and principal received by the Seller on or with respect to the Mortgage Loans after the Cut-off Date (June 1, 2006.)

- Pursuant to the *Pooling and Servicing Agreement* ("PSA"), the Purchaser represented and warranted that as of the Closing Date (June 19, 2006), FASC has assigned, transferred and conveyed the Mortgage Loans to the Trustee of the SVHLT 2006-OPT5 (the "MBS Trust.")

**The *Pooling and Servicing Agreement* ["PSA"]**

- The PSA dated June 1, 2006, which is the governing contract that created the MBS Trust: **SVHLT 2006-OPT5**, was filed with the SEC on July 12, 2006 as Form 8-K EX 4.1. The PSA was among **FINANCIAL ASSET SECURITIES CORPORATION ("FASC"),** as depositor (the "**Depositor**"), **OPTION ONE MORTGAGE CORPORATION ("OPTION ONE"),** as servicer (the "**Servicer**") and **DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC"),** in its capacity as trustee (the "**Trustee.**")

- Pursuant to the PSA, securitization depositor FASC was the owner of the Mortgage Loans before they were sold and conveyed to Trustee DBNTC in return for the mortgage pass-through certificates (collectively, the "Certificates.") The Certificates was issued in multiple classes, and which in the aggregate represented the entire beneficial ownership interest in the Mortgage Loans (the "Trust Fund.") For federal income tax purposes the Trust Fund consisted of *real estate mortgage*

*investment conduit* ("REMIC") *trusts* pursuant to the Tax Code of 1986, as amended.

○ In accordance with the Trust's REMIC election and continuing qualification, the PSA specified a "Cut-Off Date" on June 1, 2006 and a REMIC "Startup Day" (also the "Closing Date") on June 19, 2006. The strict terms and REMIC provisions of the PSA mandate a "true sale" transaction (i.e., <u>absolute sale of the mortgage loans without recourse</u>) between Seller/Sponsor OPTION ONE and Depositor FASC, and from FASC to DBNTC, in its capacity as Trustee of SVHLT 2006-OPT5 (the "MBS Trust") for the benefit of its Certificateholders (the Investors).

○ **Section 2.01 Conveyance of Mortgage Loans**. <u>Depositor FASC, concurrently with the execution of the PSA, sold, transferred, assigned, set over and conveyed to the Trustee DBNTC, without recourse for the benefit of the Certificateholders, all right, title and interest of the Depositor, including any security interest on all of and each Mortgage Loan identified on the *Mortgage Loan Schedule* that was filed with the PSA as one of its exhibits.</u>

○ In connection with such transfer and assignment, FASC declared that, the Depositor does hereby deliver to, and deposit with the Custodian on behalf of the Trustee, the following documents or instruments with respect to each Mortgage Loan so transferred and assigned (with respect to each Mortgage Loan, a "Mortgage File"):

(i)  the <u>original Mortgage Note</u>, endorsed either (A) in blank[1] or (B) in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee, without recourse" or with respect to any lost Mortgage Note, an original Lost Note Affidavit stating that the original mortgage note was lost, misplaced or destroyed, together with a copy of the related mortgage note; provided, however, that such substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans, the aggregate Cut-off Date Principal Balance of which is less than or equal to 1.00% of the Pool Balance as of the Cut-off Date;

(ii)  the <u>original Mortgage (in this case the Deed of Trust)</u>, with evidence of recording thereon, and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon or, if such Mortgage or power of attorney has been submitted for recording but has not been returned from the applicable public recording office, has been lost or is not otherwise available, a copy of such Mortgage or power of attorney, as the case may be, certified to be a true and complete copy of the original submitted for recording;

(iii)  unless the Mortgage Loan is a MERS® loan, an original Assignment, in form and substance acceptable for recording. The Mortgage shall be assigned either (A) in blank or (B) to "Deutsche Bank National Trust Company, as Trustee, without recourse";

---

[1]  When assets are transferred to a New York trust (as in the case of the SVHLT 2006-OPT5), which was formed and governed in accordance with laws of the State of New York) there has to be actual delivery in as perfect a manner as possible; a "mere recital" is not sufficient  (and, <u>endorsements in blank does not suffice either because there is nothing that indicates that something endorsed in blank is trust property, rather than the trustee's or someone else's</u>). Adherence to the Securitization Agreement determines whether there was a transfer effected or not because under NY trust law (which governs most PSAs), <u>a transfer not in compliance with a trust's documents is void</u>.

(iv) an original of any intervening assignment of Mortgage showing a complete chain of assignments;

(v) the original or a certified copy of lender's title insurance policy; and

(vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any.

Depositor FASC also declared that it delivered to the Trustee an executed copy of the *Mortgage Loan Purchase Agreement*.

- **Section 2.02 Acceptance by Trustee.** Subject to the provisions of Section 2.01 and subject to the review described below and any exceptions noted on the exception report, the Trustee acknowledges receipt by it or the Custodian on its behalf of the documents referred to in Section 2.01 above and all other assets included in the definition of "Trust Fund" and declares that it (or the Custodian on its behalf) holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of "Trust Fund" in trust for the exclusive use and benefit of all present and future Certificateholders.

The Trustee agrees that it (or a Custodian will agree on its behalf) shall, for the benefit of the Certificateholders, review, or that it or a Custodian on its behalf has reviewed pursuant to Section 2.01 each Mortgage File <u>on or prior to the Closing Date, with respect to each Mortgage Loan (or, with respect to any document delivered after the Startup Day, within 45 days of receipt and with respect to any Qualified Substitute Mortgage Loan, within 45 days after the assignment thereof)</u>. The Trustee further agrees that it or a Custodian on its behalf shall, for the benefit of the Certificateholders, certify to the Depositor and the Servicer (with a copy to the NIMS Insurer) in substantially the form attached to the PSA as Exhibit F-1, <u>within 45 days after the Closing Date</u>, with respect to each Mortgage Loan (or, <u>with respect to any document delivered after the Startup Day, within 45 days of receipt and with respect to any Qualified Substitute Mortgage, within 45 days after the assignment thereof</u>) that, as to each Mortgage Loan listed in the respective *Mortgage Loan Schedule* (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents required to be delivered to it (or the Custodian on its behalf) pursuant to Section 2.01 of this Agreement <u>are in its possession</u>, (ii) such documents have been reviewed by it (or the Custodian on its behalf) and have not been mutilated, damaged or torn and appear on their face to relate to such Mortgage Loan and (iii) based on its examination and only as to the foregoing, the information set forth in the *Mortgage Loan Schedule* that corresponds to items (1) and (3) of the *Mortgage Loan Schedule* accurately reflects information set forth in the Mortgage File. It is herein acknowledged that, in conducting such review, the Trustee (or the Custodian, as applicable) is under no duty or obligation to inspect, review or examine any such documents, instruments, certificates or other papers <u>to determine that they are genuine, legally enforceable, valid or binding or appropriate for the represented purpose or that they have actually been recorded or that they are other than what they purport to be on their face.</u>

Prior to the first anniversary date of this Agreement the Trustee (or the Custodian on its behalf)